IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| WILLIAM HALLEY, | : | Case No. 1:17-cv-732 |
| | : | |
| Plaintiff, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | **ORDER GRANTING DEFENDANT'S** |
| | : | **MOTION FOR SUMMARY** |
| SOUTHWEST OHIO REGIONAL | : | **JUDGMENT AND DENYING** |
| TRANSIT AUTHORITY, | : | **DEFENDANT'S MOTION TO STRIKE** |
| | : | |
| Defendant. | : | |

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 13) and Defendant's Motion to Strike the Inadmissible Portions of the Declaration of William Halley (Doc. 16). Appropriate responses and replies have been filed (Docs. 15, 17, 18, 19). For the reasons set forth below, Defendant's Motion for Summary Judgment will be **GRANTED**, and Defendant's Motion to Strike will be **DENIED**.

## I. BACKGROUND

### A. Facts

Defendant Southwest Ohio Regional Transit Authority ("SORTA") employed Plaintiff William Halley as a Facility Maintenance Supervisor from April 10, 2014, until his termination on December 12, 2016. (Halley Dep., Doc. 8-1 at PageID 52; Exhibits to Halley Dep., Doc. 8-2 at PageID 266.) In that role, Halley was charged with maintaining "pretty much [] everything other than the buses," including machinery, building, grounds, beautification, and repairs. (Doc. 8-1 at PageID 54.) He supervised a staff of eight employees, and he routinely trained them on "how to fix buildings and everything that went into buildings," including electrical components, hydraulics, pneumatics, and welding. (*Id.* at PageID 98.) He did not personally perform grant applications or review grant materials, and neither did his direct reports. (*Id.* at PageID 54.)

1

During his employment, SORTA appointed Halley to its Sustainability Steering Committee ("Committee"). (Doc. 8-1 at PageID 106–06.) As part of his Committee work, Halley conducted research and worked with a lighting salesman to identify the best environmentally-friendly LED fixtures to replace current outdated or unsafe lighting arrangements. (*Id.* at PageID 116–17, 123.)

Halley believed that SORTA had obtained a federal grant to be administered by Halley's boss, Paul Williams—Department Head of Maintenance—to pay for the lighting changes. (*Id.* at PageID 124.) Specifically, Williams told Halley in 2014 or 2015 that he had a "federal grant" for lighting replacements and provided Halley specific amounts, saying, "We have X amount for this building, X amount for this building, X amount for this building and we have X amount – when it came to me, it was 30,000 interior, Bond Hill garage, and 15,000 exterior, Bond Hill garage, and 15,000 interior of Access facility." (*Id.* (internal quotation mark omitted.))

Indeed, Halley and Williams exchanged emails regarding the amount of funding available for the lighting project. Halley emailed, "Will you give me the Grant # for the Lighting Projects at Bond Hill and Access?" Williams responded, "Grant project ID 15-3045 ALI code 11.44.01[.] We have $30,000 total for lights!!" (Doc. 8-5 at PageID 308.) Williams later added, "We also have $15,000 for outside parking lot LED lighting[.] Project ID 15-3046 ALI code 11.44.01." (*Id.* at PageID 309.) In a third email regarding lighting at Access, Williams responded, "That is correct[.] 15k ID 15-2951 ALI code 11.44.01[.]" (*Id.* at PageID 308,) However, Halley never saw anything in writing about a federal grant. (Doc. 8-1 at PageID 153.)

Halley was not the only one who believed SORTA had obtained a federal grant for the replacement lighting. Colin Nevitt, a retired crew member of Halley's at SORTA, testified that "everybody talked about it," and they said "federal grant." (Nevitt Dep., Doc. 10-1 at PageID

2

392–93, 396–97.) Specifically, Nevitt had conversations with Williams, Halley, Derek Tucker, and Rob Honaker[1] regarding the "federal grant," although he never saw anything in writing about a grant. (*Id.* at PageID 395–97.) Rob Honaker, then a Facility Superintendent at SORTA, also heard Williams, Halley and Derek Tucker discuss a "federal grant for LED lighting replacement," but he was "denied access" to any specific grant information. (Doc. 11-1 at PageID 429–30.) Honaker never saw anything in writing about a lighting grant. (*Id.* at PageID 431.)

Sometime after August 2016, Halley assembled his LED lighting replacement research and sought a meeting with Dave Riposo—SORTA's Chief Financial Officer—to present his research results. (Doc. 8-1 at PageID 137.) By that time, Paul Williams had told him "the federal grant was no longer available," but gave no reason for the lack of funds. (*Id.*; Doc. 15-1 at PageID 592.) When Halley continued to press for a meeting with Riposo, Williams said, "Don't worry about it. Money's gone." (Doc. 8-1 at PageID 138.) On November 30, 2016, Halley met with Riposo, Williams and others. During that meeting, Halley presented planning documents, photo metrics, rebate information, and bid documents for the switch to LED lighting. (*Id.* at PageID 146.) During his presentation, Halley indicated that they had a grant available for the lighting "but I guess the money disappeared. It's no longer available." (*Id.* at PageID 149.) According to Halley, "that infuriated Paul Williams." (*Id.*). On the drive back to the Queensgate facility after the meeting, Williams yelled at Halley and called him names. (*Id.* at PageID 164.) The minutes of the November 30, 2016 meeting indicate that Riposo asked another employee—

---

[1] Derek Tucker was a Contract Specialist at SORTA during the relevant time period. Rob Honaker was a Facility Manager at SORTA before being promoted to Facility Superintendent. (Honaker Dep., Doc. 11-1 at PageID 421.) Paul Williams, Derek Tucker, and Rob Honaker were fired in 2017 for improperly taking SORTA vehicles to be repaired at Tucker's father's auto shop at a discounted rate. (*Id.* at PageID 436–38.)

John Gardocki—to investigate any federal or state grants or rebates that may be available for the lighting project. (*Id.* at PageID 152.)

On December 3, 2016, a Saturday, Halley brought his personal log-splitter to SORTA to use in an exercise for welding training for his crew. (*Id.* at PageID 77–78, 82–83.) Honaker, Halley's supervisor at the time, had verbally approved Halley using his personal equipment for welding training, although they did not discuss a specific date for the training. (Doc. 11-1 at PageID 424–27.)

On December 6, 2016, Halley was suspended and placed on administrative leave pending an investigation into his conduct on December 3, 2016. (Doc. 8-1 at PageID 185–86.) On December 12, 2016, Williams terminated Halley's employment "for the willful misuse of SORTA/Metro equipment and materials on personal property while being paid." (Doc. 8-3 at PageID 266.)

Halley alleges that Williams terminated his employment for investigating the federal grant for the lighting project or for mentioning the missing grant money to Riposo. However, the undisputed evidence indicates that—regardless of Halley's belief that a federal grant existed—SORTA never obtained or even applied for a federal lighting grant. (*See* Plaintiff's Response to Defendant's Proposed Undisputed Facts at PageID 597–600.)

SORTA and the City of Cincinnati entered into the City/SORTA Agreement of 1973, pursuant to which the City collects a tax from everyone who works or lives in Cincinnati to fund SORTA. *See* Go-Metro, http://www.go-metro.com/quicklinks/quicklinks2/faqs (last visited March 21, 2019). Each year, SORTA submits a funding request to the City of Cincinnati for both its capital and operating expenses. (Riposo Dep., Doc. 9-1 at PageID 335.) If the City of Cincinnati approves a capital funding request, each capital project is assigned its own Project ID

number "so that you can track that money, how it's then spent, and make sure that you don't spend more than you're supposed to, and if you spend less, then that money would then potentially be reallocated to other projects on the capital side." (*Id.* at PageID 335.) If SORTA obtains grants from federal or state agencies, those are tracked with different identification numbers. (*Id.*) Sometimes, "people use those terms interchangeably outside of finance," and "Mr. Williams was not a finance person." (*Id.*) The lighting funding and amounts Williams discussed with Halley came from a capital request to the City of Cincinnati. (*Id.* at PageID 336–39.) Although he did not know it prior to his termination, Halley now admits that the lighting project does not involve federal funds. (Plaintiff's Response to Defendant's Proposed Undisputed Facts, Doc. 15-1 at PageID 597–600.)

### B. Procedural Posture

Halley initiated this action alleging that SORTA discharged him for taking lawful action to stop one or more violations of the False Claims Act, in violation of 31 U.S.C. § 3730(h). SORTA moved for summary judgment on the basis—among others—that Halley did not engage in activity protected by the False Claims Act because the undisputed facts indicate that no federal grant ever existed. Halley contends that summary judgment is inappropriate because he reasonably believed that a federal grant existed so his conduct reasonably embodied efforts to stop a False Claims Act violation.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III. ANALYSIS

The federal False Claims Act imposes liability on "any person who—(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The word "claim:"

> Means any request or demand . . . for money or property . . . that—
> (i) is presented to an officer, employee, or agent of the United States; or
> (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—
> (I) provides or has provided any portion of the money or property requested or demanded; or
> (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. . .

31 U.S.C. § 3729(b)(2)(A).

To protect employees, the Act also prohibits retaliating against those who attempt to stop an employer from violating the False Claims Act. Specifically, the statute provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others **in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter**.

31 U.S.C. § 3730(h)(1) (emphasis added).

Where a plaintiff offers circumstantial evidence of retaliation, the Court applies the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394 (6th Cir. 2015). Pursuant to that framework, the plaintiff must establish a prima facie case of retaliation by

7

demonstrating that: (1) the employee was engaged in a protected activity; (2) his employer knew that he engaged in the protected activity; and (3) the employer discharged or otherwise discriminated against the employee as a result of the protected activity. *Id.* at 398. Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence of a "legitimate, nondiscriminatory reason for the adverse employment action." *Id.* If the defendant meets its burden, the plaintiff must "demonstrate that the defendant's proffered reason represents a mere pretext for unlawful discrimination." *Id.*

For False Claims Act purposes, "internal reports 'may constitute protected activity,' provided such internal reports 'allege fraud on the government.'" *Id.* Plaintiffs may engage in protected activity "before they have put all the pieces of the fraud together" and "even if the target of an investigation or action to be filed was innocent," but "these lenient standards for establishing protected activity remain subject to a reasonable belief requirement." *Id.* at 399 (quoting, in part, *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998) and *Graham Cty. Soil & Water Conserv. Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 416 (2005) (emphasis omitted)).

As noted above, the applicable statutory language specifically includes "lawful acts done . . . in furtherance of an action under this section or other efforts to stop 1 or more violations" of the False Claims Act. 31 U.S.C. § 3730(h). "Thus, an employee's activity is protected from retaliation only if: "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *Jones-McNamara*, 630 F. App'x at 399–400 (quoting *Fanslow v. Chi. Mfg. Cty., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004)). The unique question presented in the case at bar is whether an employee who reasonably believes that he is attempting to stop a fraud on the federal

8

government is engaging in "protected activity" under the Federal False Claims Act if it turns out there was never any federal funding or activity involved. The Court concludes that he is not.

The statute under which Plaintiff initiated this action specifically protects employees and others acting "in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1). However, by the very definition of "claim," actions under the federal False Claims Act—including the anti-retaliation provision—must involve federal funds. *See* 31 U.S.C. § 3729(b)(2)(A).

Unsurprisingly, the Court was unable to find—nor did the parties identify—a single case in which a plaintiff maintained a viable retaliation claim under 31 U.S.C. § 3730(h)(1) without implicating actual federal funds. In essence, although Halley may reasonably have believed otherwise, he ultimately objected to the way in which SORTA (a political subdivision of the State of Ohio)[2] spent money it requested from the City of Cincinnati that the City of Cincinnati raised through a local tax. It is difficult to see how this purely local occurrence implicates the federal False Claims Act. This Court is neither inclined nor empowered to extend the False Claims Act beyond the statutory definitions the legislature provided.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 13), is hereby **GRANTED**. Defendant's Motion to Strike the Inadmissible Portions of the Declaration of William Halley (Doc. 16) is **DENIED AS MOOT**. This matter will be terminated from the Court's docket.

**IT IS SO ORDERED**.

Dated: March 27, 2019       S/Susan J. Dlott_____
                            Judge Susan J. Dlott
                            United States District Court

---

[2] Go-Metro, http://www.go-metro.com/quicklinks/quicklinks2/faqs (last visited March 21, 2019).